UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
**UNITED STATES OF AMERICA**,
:
:
            – against –            :    **MEMORANDUM DECISION AND ORDER**
:
**IKECHUKWU UDEOKORO**,         :    17-CR-629 (AMD)
**AYODEJI FASONU,**
:
:
                  Defendants.   :
------------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

On February 7, 2023, the defendants were convicted after a jury trial of one count of health care fraud, in violation of 18 U.S.C. §§ 1347 and 3551 *et seq*. Before the Court is their joint motion pursuant to Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal, or, in the alternative, for a new trial. (ECF No. 92.) For the reasons explained below, the motion is denied.

## BACKGROUND

A jury convicted the defendants of perpetuating a healthcare fraud scheme by supplying patients with "seat lift chairs"—recliner chairs enhanced with seat lift mechanisms—and billing their health insurance plans for different, much more expensive lift devices designed to help bed-ridden patients.

### I. The Evidence at Trial

The evidence at trial, which included documentary evidence and testimony from patients, the defendants' former employees, and representatives from insurers and manufacturers, established the following facts. The defendants co-owned Meik Medical Equipment and Supply ("Meik Medical"), which sold durable medical equipment ("DME") between 2010 and 2015.

(Trial Tr. ("Tr.") 102:6-24.)  The defendants operated a store in the Bronx where patients could buy or order medical equipment.  (Tr. at 139:11-20.)

For each order, a Meik employee put together a patient file that included a doctor's prescription, a letter and certificate of medical necessity, and the patient's identifying and contact information.  (Tr. 546:20-547:25.)  The defendants then used those files to submit claims for medical equipment to the patient's insurance.  Mr. Udeokoro assigned an HCPCS code[1] to each item in a patient's folder.  Mr. Fasonu then entered that information into various medical billing programs hosted by third party billing contractors known as "independent practice associations" ("IPAs").  (Tr. 109:18-20; 114:19-22.)  IPAs create a network of "in-service providers" like the defendants and "credential" the providers to ensure that they are licensed to serve members of insurance plans.  (Tr. 256:7-25.)  The providers use the IPA's billing platform to submit claims to the relevant insurance company.  (Tr. 258:5-16.)  In exchange for this service, the IPAs take 15 percent of what the providers earn from the billing.  (Tr. 269:5-10.)  The insurance company then decides whether to pay or deny the claim based on the information provided.  (Tr. 162:14-22.)  After the insurance company authorized a claim, Meik staff would facilitate delivery of the item to the patient.  (Tr. 548: 8-16.)

One of the items that the defendants sold was a seat lift chair, which is similar to a La-Z-Boy recliner chair, except that it has a motorized lift that raises the users' hips above their knees, enabling them to stand.  (Tr. 183:19-24; GX 12.)  The director of sales resources at Golden Technologies, which manufactures seat lift chairs, testified that DME dealers like the defendants typically paid $384 for one chair.  (Tr. 191:2-25.)  The seat lift mechanism is reimbursable for

---

[1] HCPCS stands for "Healthcare Common Procedure Coding System," a defined set of codes consisting of numbers and letters which the medical insurance industry uses to identify specific pieces of medical equipment.

approximately $250 to $325, depending on the state, and the proper code for that mechanism was E0627.[2]  (Tr. 184:2-7; 344:17-19.)

Billing records, however, showed that the defendants used different codes—E0636 and E0637—for the seat lift chairs.  (GX 604; GX 605; GX 606; GX 607.)  In fact, these codes were assigned to entirely different and far more expensive equipment in the HCPCS system.  E0636 was the code assigned to a "multipositional patient support system, with integrated lift," which could be attached to a hospital bed to lift bed-bound patients.  (Tr. 216:8-19; GX 261.)  E0637 was assigned to a "combination sit to stand frame/table system."  (GX 13.)  As discussed below, a particular insurance plan might provide reimbursement for one code but not the other.  (*See, e.g.*, Tr. 168:7-16.)[3]

Meik employees worked at the store, and "networked" at doctor's offices and senior centers to promote Meik's services to patients.  (Tr. at 106:11-21.)  A Meik employee approached witness Maria Cornelio while she was in her doctor's waiting room, and showed her a catalog of different DME, including nebulizers, wheelchairs, braces, and seat lift chairs.  Ms. Cornelio filled out an application so that Meik could verify whether her insurance would pay for any equipment that she ordered.  Ms. Cornelio ordered a seat lift chair, as well as shoes, a knee brace, and a cane.  (Tr. 213:21-214:2.)  The seat lift chair was delivered to her home; she picked up the other items from the store.  (Tr. 213:25-214:2, 20-21.)  Other customers testified that they ordered and received chairs and were not charged a co-pay or a delivery fee.  (Tr. 203:23-25; Tr.

---

[2] Paul Komishock, a representative from Pride Mobility Products, a manufacturer of seat lift mechanisms, testified that it is the lifting mechanism, not the chair, that is reimbursable.  (Tr. 341:19-21.)  The seat lift mechanisms were properly coded as E0627.  (Tr. 337:19-338:2.)  He did not know what the reimbursement rate would have been from 2010 to 2015, the time of the charged conspiracy, in New York.  (Tr. 344:20-24.)

[3] There was no evidence that the defendants ever bought the multi-positional support system or the combination sit to stand frame/table system.  Gene Smith, who invented the device for which the E0636 code was created, testified that he never sold his invention to Meik Medical.  (Tr. 248:9-12.)

87:3-9; *see also* Tr. 133 at 12.)[4]  Some patients used the seat lift chair like a regular recliner chair.  (Tr. 280:9-21; 300:23-301:1.)  Other patients testified that their chair had a massage function and helped them stand up from the chair.  (Tr. 360:13-361:5; Tr. 374:3-9.)  Nairobi Torres, a former Meik employee, testified the defendants never told her to promote the seat lift chairs to patients over other DME.[5]  (Tr. 444:22-23.)

From December 2010 to February 2014, the defendants sold approximately 500 seat lift chairs.  (GX 606, 615.)  In their submissions to insurers, they used the code for the multi-positional support system—E063—219 times and the code for the combination sit to stand/frame table system—E0637—336 times.  (GX 607.)  Insurers reimbursed the defendants large sums in each instance, generally $3,229.11 per chair.  (Tr. 392:14-22; GX 608, 609.)  In the case of one patient, using the code E0636, the defendants billed her insurance 19 times for a single lift chair, for a total reimbursement of $8,616.87.  (GX 613.)  In all, the defendants billed $3,798,420 to these two codes, which resulted in a total reimbursement of $2,358,785.  (Tr. 401:25-402:1; GX 607.)

Representatives of Fidelis and Healthfirst, insurers who administer Medicare and Medicaid in New York, testified that they relied on the providers to submit "truthful and accurate claims," and audited only a very small portion of claims.  (Tr. 318:1-24.)  There were times when insurers' representatives called Meik Medical.  For example, a representative might call to advise Meik that a claim was not covered by a patient's health insurance and had to be modified or voided.  (Tr. 167:7-12.)

---

[4] As explained above, since only the lifting mechanism was reimbursable, the costs of the chair itself would have to be covered by secondary insurance or by the patient.

[5] Meik employees were paid a commission on top of their salary for each item they sold, which could range from $50 for a nebulizer to $250 for a wheelchair.  (Tr. 108:1-3; 444:12-18.)  The commission for a seat lift chair was between $100 and $150.  (Tr. 108:1; 444:17.)

Former Meik employees testified about conversations with representatives from Healthfirst.  At times, a representative told Liliana Aguila, a former Meik employee and government witness, something like "this code is not covered . . . The one that is covered is this other code.  Do you want to change it or you want to gather more information to resubmit"  (Tr. 169:19-22.)  Defense counsel elicited the following testimony on cross-examination about codes E0636 and E0637:

> Q:  If 636 should be used instead of 637, she would tell you that, correct?
>
> GOVERNMENT:  Objection.
>
> THE COURT: Overruled.
>
> Q: She would tell you that, correct?
>
> A: She would tell us that that item wasn't covered by the insurance, and it had to be changed to the other one.
>
> Q: Meaning if 637 we used, she would tell you to use 636 instead, correct?
>
> A: Yes.
>
> THE COURT: This is for, what circumstance would this be?
>
> THE WITNESS: They would say that it was just not covered by that members' coverage. So if we wanted to submit a preapproval for that item, it had to be this code, not this code.

(Tr. 168:7-22.)

Another former employee and defense witness, Maria Diaz, testified about similar conversations with Healthfirst, and said that sometimes the insurer would tell them which codes to use for DME.  The government elicited the following testimony on cross-examination:

> Q:  Did the insur[ers], including Healthfirst, ever tell you what code to put?
>
> A:  In instances, they did call to say this code is not covered or we cannot approve this code, but we can approve a different code.

> Q: Did that include only the seat lift chairs or other DME also?
>
> A: Other. Multiple.
>
> Q: So to be clear, the Healthfirst, the insur[ers], tell you what code to put regarding seat lift chair and other DME?
>
> A: If they had to be changed, yes.
>
> Q: And you specifically remember that?
>
> A: Yes.

(Tr. 557:19-558:7.)  Former employee Yoly Taveras, a defense witness, also testified that Healthfirst told her to use E0636 instead of E0637 for the seat lift (Tr. 468:12-19), because Meik was only authorized to bill under E0636.  (Tr. 477:25-479:11.)  Stephanie Gonzalez, a former employee and defense witness, testified that insurance companies and IPAs ("Integra, Healthfirst, Academy")[6] told her to change the code for the seat lift chair from "like a 72" to E0636:

> Q: What code did they tell you to change it to?
>
> A: For the seat lift, I know it was like a 72 and then they would change it for E0636, I believe.
>
> Q: So to be clear. The code you gave was a, as you said, 72, and they said change it to a 636?
>
> A: Correct, yes.
>
> Q: Do you know how the 72 code got on the file?
>
> A: We would have Ike [Udeokoro] write it down.
>
> Q: Did he review anything before writing it on the file?
>
> A: Yes.

---

[6] Although Healthfirst is an insurer and Integra and Academy are IPAs, Ms. Gonzalez referred to them all as "the insurance."  (Tr. 501:10-14.)  There was no other evidence that Meik employees spoke to the IPAs for prior authorizations and the defendants' counsel did not argue this point in summation.

> Q: What would Ike review before he put the code in the file?
>
> THE COURT: Can I ask how you know he reviewed it?
>
> THE WITNESS: Because I was a witness. I was there.
>
> THE COURT: You saw him do it? Okay, go ahead.
>
> A: He would look at the medical reports of the patient and these diagnostic codes was already in the prescription, as well as the letter of medical necessity.
>
> Q: Who created the diagnostic code?
>
> A: The doctor.

(Tr. 502:4-20.)[7]

The defendants did not deny that they used HCPCS codes E0636 and E0637 to bill for the recliner chairs, or that those codes were for different equipment. Instead, they argued that they believed in good faith that both codes corresponded to the chairs that they sold.

## II. Motions in Limine

Prior to trial, the government moved to preclude the defendants from arguing that insurance companies and IPAs processed and paid the insurance claims without identifying any problems with the defendants' billing procedures. (ECF No. 47.) The defendants responded that the acts and omissions of these entities were relevant to the defendants' intent or knowledge to commit fraud. (ECF No. 54.) At a pre-trial conference on January 24, 2023, the defendants conceded that it would be improper to "blame the victim," but argued that Healthfirst and the IPAs "told the defendants which code to use." (January 24 Pretrial Conference Transcript, (ECF No. 92-1 at 7:14-8:17.) I ruled that the IPAs' or insurers "implicit approval" of the defendants'

---

[7] The doctor-provided code to which Ms. Gonzalez referred was "a diagnosis code" consisting only of numbers and decimals—no letters—to indicate the patient's condition or ailment. These are not HCPCS codes. (Tr. 505:19-21.)

claims was not admissible evidence,[8] but that certain communications between the IPAs or insurers and the defendants, including, for example, evidence that someone from one of these entities told the defendants or their employees which codes to use, were admissible, unless excludable on other grounds. I directed the parties to see if they could agree on any such communications. (ECF No. 92-1 at 8-10.) At a second pretrial conference the defendants had not yet identified any specific communications, and I reserved the decision for trial on a question-by-question basis. (January 27 Pre-trial Conference Transcript, (ECF No. 92-2) at 5.) At trial, over the government's objections, I permitted the defendants' former employees to testify about these specific conversations. (Tr. 466:3-25.)

## DISCUSSION

### I. Motion for Acquittal

A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to the prosecution," and will uphold the jury's verdict if it determines that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (citation omitted); *United States v. Mahaffy*, 499 F. Supp. 2d 291, 294 (E.D.N.Y. 2007) ("To succeed, any Rule 29 motion must demonstrate that, viewing the evidence in the light most favorable to the government, no rational trier could have found the essential elements of the crime charged beyond a reasonable doubt." (internal quotation marks and citation omitted)), *aff'd*, 283 F. App'x 852 (2d Cir. 2008). Viewing the evidence in the light most favorable to the prosecution means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United*

---

[8] I also ruled that the IPA and insurers' audits of Meik's billing practices were not admissible for this purpose.

*States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted). A court "must consider the Government's case in its totality rather than in its parts," and the sufficiency test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (internal citations omitted). Thus, a defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotation marks and citation omitted).

To prove health care fraud under 18 U.S.C. §1347, the government was required to establish beyond a reasonable doubt each of the following elements: "(1) there was a scheme to defraud; (2) the defendant[s] knowingly and willfully executed or attempted to execute that scheme, with the intent to defraud; and (3) the target of the scheme was a health care benefit program." *United States v. Nekritin*, No. 10-CR-491, 2012 WL 37536, at *3 (E.D.N.Y. Jan. 9, 2012). The defendants argue that no rational juror could have concluded beyond a reasonable doubt that the defendants acted with the intent to defraud. They cite the testimony of Ms. Aguila and Ms. Diaz that they were told to bill for the seat lift chair under the code E0636 or E0637 depending on whether the patient was covered by Medicaid or Medicare. Drawing all inferences in the government's favor, as I must, the evidence of the defendants' intent "was not so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Petit*, No. 19-CR-850, 2021 WL 673461, at *7 (S.D.N.Y. Feb. 21, 2021), *aff'd*, No. 21-543, 2022 WL 3581648 (2d Cir. Aug. 22, 2022).

The defendants claimed at trial that they simply made a mistake about the codes, and that representatives of both health insurers and IPAs told them to use the disputed codes—E0636 and E0637. The defendants' former employees testified generally that Healthfirst prompted them to change a code if it was not covered by a patient's health insurance, and specifically, that the

insurer would tell them to use the code E0637 if E0636 was not covered.  (Tr. 168:7-22.)  Of course, it was up to the jury to determine whether that evidence was credible.  But even if a Healthfirst representative told the defendants' staff that they should use E0637 instead of E0636, because, for example, the patient was covered by Medicaid rather than Medicare, that would not negate fraudulent intent; the defendants would still need to show that using the E0636 code in the first instance was a good faith mistake.  Although Ms. Gonzalez vaguely recalled that an unspecified insurer or IPA told to her to change an item code from "like a 72" to E0636, the relevance of this testimony to the defendants' intent was undermined by evidence that the defendants submitted code E0636 for seat lift chair claims over a year before that witness began working at Meik.  (Tr. 506:17-507-23.)  In addition, none of the defendants' former employees testified that the Healthfirst representative in question understood that the defendants were seeking reimbursement for what was basically a La-Z-Boy with a seat lift; rather, the evidence suggested that to the extent there were communications, they were related only to whether Medicare and Medicaid authorized the code used, not that the entities knew that the defendants were applying them to seat lift chairs.

Moreover, other evidence contradicted the defendants' claim that they had no fraudulent intent.  Witnesses from insurers and IPAs testified that they relied on providers like the defendants to give them accurate information about the medical equipment for which they sought reimbursement, including that the codes used corresponded to the products sold.  As even the defense witnesses testified, doctors did not provide reimbursement codes for the DME that they prescribed as medically necessary.  (Tr. 552:2-11 (discussing a patient file introduced as GX 520).)  The jury was entitled to credit that evidence.

A rational jury could also consider the significant evidence of fraudulent intent: the disparity between the cost of the chair—$384—and the reimbursements that at the defendants received—$3,229.11. Documentary evidence showed that in one case, the defendants sought reimbursement 19 times for the same chair, which the jury could also consider as evidence of fraudulent intent. Similarly, the jury could conclude that the dramatic difference between the equipment at issue—the cheap recliner chairs, on the one hand, and the complicated apparatus designed for moving bed-bound patients, on the other, was a factor that established fraudulent intent. And, the jury could consider that the defendants used two codes for the same product in determining fraudulent intent. In short, because the evidence was sufficient to establish proof beyond a reasonable doubt, granting the defendants' motion for acquittal would usurp the jury's role. *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citing *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Accordingly, the motion for acquittal is denied.

## II. Motion for a New Trial

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While the court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," that discretion should be exercised "sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001) (internal quotation marks and citation omitted); *see also United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ("Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict."). The Court should grant a Rule 33 motion only if "letting a guilty verdict stand would be a manifest injustice," because of "a real concern that an innocent

person may have been convicted." *Ferguson*, 246 F.3d at 134 (internal quotation marks and citation omitted).

Accordingly, when a defendant's motion for a new trial is based on the court's evidentiary rulings, the relevant inquiry is not whether those evidentiary rulings were wrong but whether they amounted to a "manifest injustice." *United States v. Aiyer*, 470 F. Supp. 3d 383, 410 (S.D.N.Y. July 6, 2020) (stating that arguments about evidentiary rulings "are improper on a Rule 33 motion absent manifest injustice"), *aff'd*, 33 F.4th 97 (2d Cir. 2022). "A district court must 'defer to the jury's resolution of conflicting evidence,' unless the evidence was 'patently incredible or defied physical realities,' or an 'evidentiary or instructional error compromised the reliability of the verdict.'" *Petit*, 2021 WL 673461, at *7 (quoting *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020)). As with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Archer*, 977 F.3d at 189 (citing *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000)).

The defendants claim the Court should have allowed them to show that the IPAs "failed" to inform the defendants that they were using the wrong code for the seat lift chairs, which in turn would have shown that the defendants did not realize that they were using the wrong code and did not intend to commit fraud. The defendants also say that they were precluded from establishing that the IPAs' role as a billing intermediary "negate[d] the defendant's knowledge that the codes they used were wrong . . . ." (ECF No. 92 at 15.)

To the extent that the defendants were seeking to negate intent by showing that the IPAs and insurers did not discover the fraud —in other words, to blame the victims—that would not have been permissible. It is well-settled in this circuit that a defendant charged with a fraudulent

scheme may not assert as a defense the victim's failure to discover the fraud. *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004). In *Thomas*, the Second Circuit rejected Thomas's argument that the trial judge should have instructed the jury that "that there can be no fraud if the victim did not act as a person of ordinary prudence and comprehension would." *Id.* at 241-42. The Second Circuit found that the prosecution was required to prove that Thomas acted with the requisite knowledge and intent—not that the victims were "persons of ordinary prudence and comprehension." *Id.* at 243.[9]

Guided by this general principle, courts in this district have precluded defendants from arguing that the payment of claims demonstrates a defendant's good faith and lack of intent. *See United States v. James*, 607 F. Supp. 3d 246, 255 (E.D.N.Y. 2022) ("Defendant is precluded from arguing at trial that the insurance companies' payment of claims is relevant to whether he acted with the requisite intent."); *United States v. Ahmed*, No. 14-CR-277, 2016 WL 8732355 *4 (E.D.N.Y. 2016) ("Defendant may not argue that he did not intend to defraud Medicare because Medicare paid his claims, negligently or otherwise."); *Nekritin*, 2011 WL 2462744 at *7 ("the court precludes defendants from arguing or presenting evidence that Medicare and Medicaid's payment of their claims is a defense to health care fraud.")

According to the defendants, because the IPAs "were responsible for approving all claims submitted to the insurers," the fact that they did not identify problems with the defendants'

---

[9] The so-called "ordinary prudence standard" arose in the context of a fraud scheme in which the defendant did not make any affirmative misrepresentations to advance the fraud. The Fifth Circuit rejected the argument that a scheme was not fraudulent if it did not involve affirmative misrepresentation, and held that any scheme with the requisite intent could constitute fraud. *Silverman v. United States*, 213 F.2d 405 (5th Cir. 1954) ("If a scheme is devised with the intent to defraud [] the fact that there is no misrepresentation of a single existing fact makes no difference. It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension . . . .")). The Second Circuit later clarified that "[t]he ordinary prudence standard [] focuses on the violator, not the victim" and "is not a shield which a defendant may use to avoid a conviction for a deliberately fraudulent scheme." *Thomas*, 377 F.3d at 243.

billing practices "increases the likelihood that the defendants did not intend to defraud the insurers or the government." (ECF No. 92 at 10.) They also say that the prohibition against the "blame-the-victim" defense applies only to the insurers who paid out the fraudulent claims, not the IPAs who facilitated those claims, because the IPAs benefitted from the fraud when they received a portion of the resulting reimbursements. Neither argument is persuasive.

The first argument is a variation of the defense that courts have rejected—that the IPAs had some obligation to catch the defendants in the act of misrepresenting the kind of equipment for which they sought reimbursement, and that their failure to do so absolved the defendants from criminal liability. The second argument—which the defendants are making for the first time in their motion—is that the prohibition against "blaming the victim" does not apply to IPAs because the IPAs were not victims of the fraud.

The defendants made affirmative misrepresentations when they used the wrong codes to claim reimbursements from health insurers. Whether the IPAs caught the misrepresentations, or even tacitly approved of them, is not relevant to what the defendants knew or intended in making those misrepresentations. The point is that the defendants' intent, not the mechanics of a particular scheme, makes conduct fraudulent. Thus, the prohibition against "blaming the victim" defense applies.

The Court permitted the defendants to show that they relied on representations by either the insurers or the IPAs that E0636 and E0637 were the right codes for seat-lift chair claims. Counsel elicited testimony on cross-examination of a government witness, and on direct examination of additional witnesses, that insurers sometimes corrected them on the use of various codes, in some instances telling the employee to modify the codes they used. (*See, e.g.*, Tr. 272:4-22; 167:7-12; 168:4-168:25 (overruling government objection to testimony of

communication with health insurer).).  Counsel also argued in summation that the jury could reasonably infer that these instructions to change the codes to E0363 and E0637 corresponded to whether the patient was covered by Medicare or Medicaid, which may have caused the defendants to understand that the same chair could be reimbursed under two different codes.  (Tr. 652:5-654:25.)  The Court did not preclude the defendants from eliciting testimony or making arguments that supported their narrative.  The defendants made the choice not to call additional witnesses, such as the Healthfirst caseworker who allegedly made representations about the item codes to Meik employees, or to submit documentary evidence in support of this defense.  The defendants also opted not to call their expert on medical billing, who sat in the courtroom for most of the trial.

For these reasons, the Court's narrow ruling, which was consistent with circuit precedent, did not cause "manifest injustice."  The defendants were given ample opportunity to present their defense of mistake.  As discussed above, in addition to eliciting testimony that a Healthfirst representative advised them on codes in a general way, the defendants also argued that the codes were ambiguous and confusing, and that the descriptions for the codes they used reasonably described the seat lift chairs.  (Tr. 616:14-617:6 ("if you look at the [] 636 code, multipositional patient support system with integrated lift and patient accessible controls, that also fits.  If you look at it, it still makes sense because the chair is multipositional.  The chair has the integrated lift and there was a controlling device for the patient to access."); *see also* Tr. 654:7-8 ("They put those codes because they fit the chair like a glove.").)  The jury considered these arguments and rejected them, which as explained above, was rational in view of the evidence against the defendants.  Accordingly, the defendants' motion for a new trial is denied.

## CONCLUSION

For these reasons, the defendants' motion for an acquittal or for a new trial is denied.

**SO ORDERED.**

/s/ Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
June 22, 2023